UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

D-1 BIJAN WOODLEY
D-2 KANEE GOODE
D-3 JATEESHA TAYLOR

       Defendants.

Case No. 15-cr-20007
Honorable Laurie J. Michelson
Magistrate Judge David R. Grand

---

**OPINION AND ORDER DENYING MOTION TO SUPPRESS STATEMENTS IN
VIOLATION OF FIFTH AMENDMENT [112], DENYING MOTION TO SUPPRESS
STATEMENTS IN VIOLATION OF SIXTH AMENDMENT [113], AND DENYING
MOTION FOR SPOLIATION SANCTIONS [114]**

---

Defendant Bijan Woodley has been charged in a superseding indictment for his alleged

involvement in three separate carjackings in August 2014, December 2014, and January 2015.

(Dkt. 23.) Following the initial indictment (on the December 2014 carjacking), Woodley was

interrogated by two to three Detroit police officers on January 12, 2015. Before questioning

began, Woodley signed a standard *Miranda* waiver. The officers questioned Woodley for three

hours and 51 minutes, and he expressed some uncertainty as to why he was being interviewed.

The officers asked Woodley about a range of topics but eventually showed him a video of the

December 2014 carjacking. They also made comments about Woodley's possible separation

from his two-year-old son and the potential for Woodley to get a "better deal" if he was "first to

the table" to talk about the crime. After about two-and-a-half hours, the officers informed

Woodley that he had been indicted. The first three hours of the interrogation were recorded on

video with corresponding audio. Following a cigarette break, the final 51 minutes were still

videotaped, but without sound. The Government says that during these last 51 minutes, Woodley confessed his involvement in the December 2014 carjacking. The parties did not notice that the audio was not recorded until discovery.

Woodley now seeks suppression of his confession during those final 51 minutes pursuant to the Fifth and Sixth Amendments and asks for spoliation sanctions against the Government for the unrecorded audio. (Dkts. 112, 113, 114.) The motions are fully briefed, and the Court heard oral argument on April 22, 2016. For the reasons set forth below, Woodley's motions will be denied.

## I. BACKGROUND

On January 8, 2015, the grand jury indicted Woodley and co-defendant Kanee Goode, charging them in connection with a December 30, 2014 carjacking. (Dkt. 1.)

A few days later, on January 12, 2015, Woodley was arrested by officers of the Detroit Police Department Commercial Auto Theft Unit. (Dkt. 112 at 1.) He was transported, in handcuffs, to the Detroit Police Homicide Unit for questioning and was placed in an interrogation room at approximately 7:50pm.

The interview lasted for three hours and fifty-one minutes. (Dkt. 112 at 3.) The room had two cameras, and the entirety of the interview was recorded. (*Id*. at 6.) However, there is no audio recording for the final 51 minutes. (*Id.*) "The government tried a variety of methods to recover the audio; none were successful." (Dkt. 122 at 3.) The Court designated the tape as a defense exhibit during the hearing. Upon examination of the recordings, it became apparent that "CAM 1" recorded video but no sound, and that "CAM 2" recorded both video and sound. Following a break in the interrogation, only CAM 1 recorded the final 51 minutes—without

2

sound. The Court summarizes the recording of the first three hours insofar as it is relevant to the pending motions.

At approximately 8:10pm, Woodley's hand-cuffs were removed and he was advised of his Miranda rights. (Dkt. 114-2.) At 8:13pm, Woodley initialed and signed a *Miranda* waiver. (Dkt. 120-1.) The waiver stated,

> I understand that: (1) I have a right to remain silent and that I do not have to answer any questions put to me or make any statements. (2) Any statement I make or anything I say will be used against me in a Court of Law. (3) I have the right to have an attorney (lawyer) present before and during the time I answer any questions or make any statement. (4) If I cannot afford an attorney (lawyer), one will be appointed for me without cost by the Court prior to any questioning. (5) I can decide at any time to exercise my rights and not answer any questions or make any statement. I understand that these are my rights under the Law. I have not been threatened or promised anything, and I now desire and agree to answer any questions put to me or to make a statement.

(*Id.*) Although the officers noted, "The rights, as defined above, have been explained to him/her and he/she has agreed to make a voluntary statement but has refused to sign this certificate," Woodley's signature appears on the form, and he placed his initials beside each of the listed rights. (*Id.*)

Woodley was initially interrogated by two officers: Detroit Police Department Officer Richard Houser, an African-American male, and FBI Task-Force Officer Lori Ann Dillon, a Caucasian female. He was given bottled water. As Woodley signed the *Miranda* form, he asked, "What am I here for?" and "What time my mother's picking me up?" (Tape at 20:13.) Woodley stated that he had not been drinking or smoking that evening. (*Id.* at 20:14.) He told the officers that he had attended Southeastern Oak Park High School and Berkley High School but had "lost focus" and did not graduate. (*Id.* at 20:14.) As the conversation continued, Woodley made several more comments implying that he did not know why he was being interrogated. At 8:25pm, Officer Houser told Woodley, "You know why you're here." (*Id.* at 20:25.) "I really

don't . . . no sir," Woodley responded. (*Id.*) Woodley said he had overheard that he was being taken to homicide, but he hadn't "do[ne] no homicide." (*Id.*) "We ain't talking about no homicide . . . you can't go by that," responded Houser. (*Id.* at 20:26.) The officers discussed with Woodley his associates and lifestyle in general, and showed him a few pictures, and asked him to identify those individuals (including one of Goode). Woodley then stated, "I think you're interrogating the wrong person." (*Id.* at 20:40.)

After a ten-minute break, the officers resumed their questioning, and the topic seemed to turn to the December 2014 carjacking. Woodley had not been informed of the indictment at this point. The officers showed Woodley several pictures, including one he later acknowledged as Kanee Goode. (*Id.* at 21:08, 21:25.) They asked what "Jateesha" might have said about Woodley. (*Id.* at 21:36.) Woodley commented that the officers were "trying to connect the dots to something." (*Id.*) The officers also mentioned a silver Durango. (*Id.* at 21:38.) Dillon commented that Woodley needed to "get right" and get things "off [his] conscience." (*Id.* at 22:03.) At 10:05pm, the officers showed Woodley the surveillance video from the Coney Island on the night of the carjacking. (*Id.* at 22:05.) The officers asked him three times whether he was involved in the December 2014 carjacking (and whether it was him in the video): at time stamps 10:09pm, 10:11pm, and 10:12pm. He denied involvement, and he stated, "get me out of here" (*Id.* at 22:09); "That ain't me, boss," (*Id.* at 22:11); "That's not me in the video," (*Id.* at 22:13).

Finally, at 10:12pm, Dillon informed Woodley, "You've been indicted for this carjacking . . . you're going to go through the federal system." (*Id.* at 22:12.) Dillon explained,

> How it works [in the federal system] is everybody gets a chance to tell their story . . . with the federal prosecutors and the federal judges, usually the first man to the table gets the best deal . . . people who tell us to kick rocks, we go outside and kick rocks, and we lock you up for a really long time, a really long time . . . This is one carjacking, if I keep digging . . . I'm trying to help you out and I'm telling you first man to the table gets the best deal . . . I don't need you to tell me

anything tonight because I am going to see you again and again and we're going
to sit down like this over and over again.

(*Id.* at 22:13–22:15.) Woodley replied, "I never did no carjacking. . . . That ain't me, I don't want

to keep watching [the surveillance video]." (*Id.* at 22:15–22:18.) (Woodley later asked to see the

surveillance video again. (*Id.* at 22:21).) Dillon continued to comment, "You need my help[.]"

(*Id.* at 22:17.) "The two of you [Goode and Woodley] are going to go down and the third person

is going to get away [with the carjacking]." (*Id.* at 22:19.) "You're going to be put away for a

really long time." (*Id.* at 22:29.) "I care . . . I want to help [you] through this." (*Id.*) "You're not a

bad dude but you made a mistake." (*Id.* at 22:33.)

The officers then presented Woodley with a picture of his son. (*Id.* at 22:34.) Houser

commented, "You care more about [the other individuals involved in the carjacking] than [your

son]. . . . at some point in your life you've got to stand up for something." (*Id.* at 22:37.) Dillon

asked, "You don't want some other dude raising your son, do you? . . . You want to be out here

teaching him how to be a real man." (*Id.*) Houser commented, "If your son [were here] . . . he

would . . . ask you" to tell the truth. (*Id.* at 22:41.) As Woodley leaned back in his chair, Houser

stated "I can see us getting you now, reality's setting in." (*Id.* at 22:41.) "You're the first one

here, you're at the forefront," Houser continued. (*Id.*) "I ain't got much to say," Woodley

responded. (*Id.*) "You ain't gotta say much, you just gotta [say] the truth," Houser replied. (*Id.*)

Woodley commented, "The only thing I care about is my son." (*Id.* at 22:42.) Dillon then

asked, "How has it felt these last couple days running? This shit gets old, it's tiresome." (*Id.* at

22:43.) Woodley responded, "Yeah, that shit tiresome. I'm ready to turn myself in." (*Id.*) Houser

asked, "For what?" but Woodley did not respond (*Id.*) And when Houser asked, "Is that you in

the video?" Woodley responded "No." (*Id.* at 22:44.) The officers asked some more questions

about the carjacking, but Woodley did not respond. He then stated that he was "disappointed in myself" but did not say why. (*Id.* at 22:45.)

Dillon then told Woodley he should "let go of the hood" because "ain't nobody gonna care in the hood" if Woodley were imprisoned in "whatever mountain the feds are gonna put you[.]" (*Id.* at 22:47.) "First to the table, we could work with that," commented Dillon. (22:47.) If not, "I'm going to be forced to go find more carjackings and more incidents that you were involved in and then your numbers are going to keep climbing and climbing."

At approximately 10:50pm, Houser decided to give Woodley a break to smoke a cigarette. (*Id.* at 22:49.) Officer Moises Jimenez escorted Woodley outside. (Dkt. 114-2). At that point, it appears that both cameras stopped recording. Dillon, Houser, Jimenez and Woodley returned to the interrogation room at 11:01pm. But only CAM 1 resumed recording. Thus, the final 51 minutes of the interrogation were recorded without sound.

Officer Dillon stated in her written report, drafted on January 15, 2015 and entered on January 26, 2015, that Woodley confessed his involvement in the December 2014 carjacking— implicitly in those final 51 minutes:

> WOODLEY confessed to being involved in a carjacking that took place on December 30, 2014 at 19100 Mound, Detroit, Michigan. WOODLEY denied knowing the other two subjects who assisted WOODLEY during the carjacking. WOODLEY stated that he was with two other unknown black males who provided the weapons that were used during the robbery.

(Dkt. 114-1.)

Officer Jimenez prepared another report on behalf of Officers Dillon and Houser on August 28, 2015, "due to the audio/video equipment malfunction." (Dkt. 114-2.) The report states that during the January interrogation:

> Subject . . . state[d] that he was picked up in a truck and that a long rifle was already in there, subject continue[d] to say that he [knew] the victim and that he

had first seen him at the gas station across from the Coney Island, subject then stated that they followed the victim to the Coney Island, where he, the subject[,] was armed with a rifle and demanded the victims' items and vehicle (robbing the victim items: jewelry and wallet) subject then stated that they left the area, taking the victims belongings to include the white in color Chrysler 300 and was dropped off. Subject refused to give information on the other individuals he was participating with and/or any information of their identity.

(Dkt. 114-2.) The report further stated, "Subject was given ample opportunity to take a break, go to the bathroom and was not intoxicated nor on any drugs at the time of the interview." (Dkt. 114-2.)

Woodley made his initial appearance in this Court on January 13, 2015, the day after his arrest and interrogation. On March 5, 2015, the grand jury returned a superseding indictment, adding Jateesha Taylor as a co-defendant and adding counts against Woodley based on the August 2014 and January 2015 carjackings. (Dkt. 23.)

## II. ANALYSIS

Woodley challenges both the interrogation itself and the incomplete audio recording of it. He seeks to suppress his confession on Fifth and Sixth Amendment grounds and exclude the video from evidence. In the alternative, if live testimony from the interrogating officers is permitted, Woodley asks the Court to allow him to introduce the first three hours of the interrogation and instruct the jury regarding the missing audio in the last 51 minutes of the tape.

### A. Fifth Amendment

Woodley argues that his alleged confession was involuntary because the officers used coercive tactics during the interrogation. "When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)). Three requirements must

be met before the Court can find a confession involuntary due to police coercion: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Id.*

"Threshold to the determination that a confession was 'involuntary' for due process purposes is the requirement that the police 'extorted [the confession] from the accused by means of coercive activity.'" *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988). The video makes clear that the officers did not coerce Woodley through any threatened or physical force. Nor did they verbally abuse him in any way. And the officers provided Woodley with relatively comfortable surroundings. Woodley's claim is thus based on the content of the Officers' statements, not the manner in which they were made. In particular, the officers suggested that Woodley might get a better deal if he was "first to the table," explained that carjacking carried a long prison sentence, urged Woodley to consider the impact on his son if he were to go to prison, and suggested they could link him to other carjackings if he did not cooperate. The Court examines these statements in turn.

Regarding the officers' statements implying that Woodley would get a better deal if he was "first to the table," the Sixth Circuit has noted that "[a] promise of leniency in exchange for cooperation may be a relevant factor in determining whether a confession was involuntary," but "such statements usually are permissible." *United States v. Delaney*, 443 F. App'x 122, 128 (6th Cir. 2011) (citation omitted); *United States v. Stokes*, 631 F.3d 802, 809 (6th Cir. 2011) ("[P]romises to inform a prosecutor of cooperation do not, *ipso facto*, render a confession coerced."); *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992). However, "promises of leniency may be coercive if they are broken or illusory." *Johnson*, 351 F.3d at 262. Here, the

8

officers merely suggested to Woodley that if he cooperated, he might be able to obtain a lower sentence if convicted. These statements were not false or illusory. *Delaney*, 443 F. App'x at 129 ("Certainly, the [officers] made these statements with the intent to compel [Woodley] to testify, but they were not false."). "[S]peculation that cooperation will have a positive effect" does not render a subsequent statement involuntary. *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005). And all the officers did here was speculate. They said, "usually the first man to the table gets the best deal" (Video at 22:13), and, "First to the table, we could work with that," (*Id.* at 22:47). These speculative statements did not render Woodley's subsequent confession involuntary. *See United States v. Nash*, 910 F.2d 749, 753–53 (11th Cir. 1990) ("Although Cunicelli told Nash that cooperating defendants generally 'fared better time-wise,' this statement did not amount to an illegal inducement.").

Nor was it coercive for the officers to suggest to Woodley that he would face a long prison term if convicted. "A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will. . . . as long as the statement results from an informed and intelligent appraisal of the risks involved rather than a coercive atmosphere, the statement may be considered to have been voluntarily made." *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) (cited with approval in *United States v. Neal*, 780 F.2d 1023 (6th Cir. 1985) (unpublished, per curiam)). As the government points out, at the time of the interview, Woodley had been charged with a violation of 18 U.S.C. § 924(c)(1)(A) (brandishing a firearm during a crime of violence), which carries a penalty of "not less than 7 years[.]" Informing Woodley of the potential sentence he was facing was not objectively coercive.

9

And telling Woodley that he would not have much contact with his son if he were to receive such a prison sentence was not objectively coercive either. Though the officers told Woodley that he would not see his son and that if he were to be imprisoned, someone else might end up raising his son, they did not threaten any legal or economic consequences to Woodley's son. *Compare Lynumn v. Illinois*, 372 U.S. 528, 532–34 (1963) (holding a confession was involuntary where, among other things, agents told the defendant that "state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'"), *with McCalvin v. Yukins*, 444 F.3d 713, 721 (6th Cir. 2006) (holding that it was not objectively coercive for officers to tell a murder suspect that "if she went to prison for first-degree murder, she would spend the rest of her life in prison and would not have contact with her family, including her children").

The same analysis above applies to Officer Dillon's statement that she would "be forced to go find more carjackings and more incidents that [Woodley was] involved in" and that would also increase his potential sentence. The Sixth Circuit examined a situation where a defendant claimed that the officer "intimidated him into confessing by . . . threatening to charge him with other crimes and keep him from his wife." *United States v. Gatewood*, 230 F.3d 186 (6th Cir. 2000). The Sixth Circuit's holding upon rehearing *en banc* was as follows:

> Gatewood also challenges the constitutionality of his conviction by claiming that his confession was involuntary and the eyewitness identification was improper. To prove an unconstitutional confession, coercive police activity is a necessary predicate to finding that a confession is not voluntary. Gatewood has failed to advance any evidence of coercive police activity or evidence that his will was coercively overborne. He has not proven his confession was involuntary, and it was properly admitted.

*Gatewood*, 230 F.3d at 193.

10

The Court finds that the same result is warranted here. Over the course of nearly four hours, the officers painted a realistic picture of Woodley's situation and the process that was about to unfold. They did not make any illusory promises, nor did they make any unfounded threats to either Woodley or his son. While these statements may have upset Woodley, they did not rise to the level of coercive police activity. Moreover, the first three hours of the tape reflect that the officers never raised their voices to Woodley and accommodated his requests for water and for a cigarette break. Because the police activity in question was not objectively coercive, the Court will deny Woodley's motion to suppress statements in violation of the Fifth Amendment.

### B. Sixth Amendment

Woodley next argues that his statements should be suppressed because the interrogation violated his Sixth Amendment right to counsel. More specifically, Woodley claims he did not know he had been indicted or arrested at the time he agreed to speak to the officers.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." Amend. VI U.S. Const. The right is "offense specific," *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991), and "attaches only at or after the initiation of adversary judicial proceedings against the defendant." *United States v. Gouveia*, 467 U.S. 180, 187 (1984). "[T]he Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." *Montejo v. Louisiana*, 129 S. Ct. 2079, 2085 (2009).

"[W]hen a suspect waives his right to counsel after receiving warnings equivalent to those prescribed by *Miranda v. Arizona*, . . . that will generally suffice to establish a knowing and intelligent waiver of the Sixth Amendment right to counsel for purposes of postindictment

questioning." *Michigan v. Harvey*, 494 U.S. 349, 1179 (1990) (citation omitted); *Montejo*, 129 S. Ct. at 2085. As the Supreme Court explained in *Patterson v. Illinois*, 487 U.S. 285, 297 (1988), the key is that *Miranda* warnings inform the suspect that any statements could be used against him in court. "This is the ultimate adverse consequence [a suspect] could have suffered by virtue of his choice to make uncounseled admissions to the authorities. This warning also suffice[s] . . . to let [a suspect] know what a lawyer could 'do for him' during the postindictment questioning: namely, advise petitioner to refrain from making any such statements." *Id.* at 294.

The *Patterson* Court acknowledged that "not all Sixth Amendment challenges to the conduct of postindictment questioning will fail whenever the challenged practice would pass constitutional muster under *Miranda*" because "the Sixth Amendment's protection of the attorney-client relationship . . . extends beyond *Miranda*'s protection of the Fifth Amendment right to counsel." *Id.* at 295 n.7. And the Supreme Court seemingly left open the "occasional suggestion that, in addition to the *Miranda* warnings, an accused should be informed that he has been indicted before a postindictment waiver is sought," citing *United States v. Mohabir*, 624 F.2d 1140, 1150 (2d Cir. 1980). 487 U.S. at 295 n.8. In that case, the Second Circuit held that the defendant's post-indictment statements to prosecutors, made without knowledge of the indictment, should have been suppressed. *Mohabir*, 624 F.2d at 1151. "Some additional indication was required that appellant understood the nature and the importance of the Sixth Amendment right he was giving up." *Id.*

However, upon revisiting the issue post-*Patterson*, the Second Circuit found that continuing to follow the *Mohabir* holding would "make a patchwork of the law in this area— retaining procedures premised on the need to effect a supposed 'distinction between Fifth and Sixth Amendment rights[.]'" *United States v. Charria*, 919 F.2d 842, 847 (2d Cir. 1990). Instead,

"*Patterson* counsels a shift in the Sixth Amendment waiver analysis away from the abstract importance of the right to counsel toward a practical inquiry[.]" *Id.* (citing *Patterson*, 487 U.S. at 298). Thus,

> [o]nce an accused understands that he is under arrest and, after receiving the *Miranda* warnings, understands his right to remain silent, the potential consequences of speaking, and his right to counsel, including during interrogation, he is fully apprised of the information needed to make a knowing waiver of the sixth amendment right; providing him with the information that he is also under indictment, the desirability of which is debatable, is not constitutionally required.

*Charria*, 919 F.2d at 847; *see also United States v. Bing Yi Chen*, 433 F. App'x 14, 15 (2d Cir. 2011). Woodley argues, based on this quoted passage, that the *Charria* court presumed that the defendant had "constructive notice" of the charges pending against him due to the fact of his arrest.

Unlike in *Charria*, Woodley argues, Woodley was never informed that he was under arrest. He also notes that many other cases (relied on by the Government) where a Fifth Amendment waiver was found to function as a Sixth Amendment waiver involved defendants who knew they were under arrest. *See, e.g.*, *United States v. Muca*, 945 F.2d 88, 89 (4th Cir. 1991); *Riddick v. Edmiston*, 894 F.2d 586, 590–91 (3rd Cir. 1990); *Quadrini v. Clusen*, 864 F.2d 577 (7th Cir. 1989); *Norman v. Ducharme*, 871 F.2d 1483, 1487 (9th Cir. 1989). Thus, he says that the *Miranda* waiver he signed could not have sufficed to waive his Sixth Amendment right to counsel: "In the end, an accused cannot knowingly and voluntarily waive a Constitutional right about which they have not been apprised." (Dkt. 126 at 4.)

The Court notes that the Eighth Circuit rejected Woodley's exact argument in *United States v. Chadwick*, 999 F.2d 1282 (8th Cir. 1993) ("Although the district court correctly observed that the defendant in each of the relevant appellate decisions [*Charria*, *Riddick*, *Muca*,

13

*Quadrini*, and *Norman*] was under arrest, we do not find this factual distinction to be dispositive [for Sixth Amendment waiver purposes].").

But the Court need not address the question. First, at the time Woodley made the statements he seeks to suppress, he had been advised by Dillon that he had been indicted for carjacking—Dillon informed him of the indictment at 10:12pm, and he confessed at some point after 11:01pm. Additionally, facts readily apparent from the video support the conclusion that Woodley knew he was under arrest.

In situations involving *Miranda*'s "in custody requirement," in the absence of a formal arrest, courts ask "how a reasonable man in the suspect's position would have understood the situation." *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (citing cases). Relevant factors include "whether a reasonable person in the defendant's position would feel free to leave," as well as

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police . . . [or] acquiesced to their requests to answer some questions.

*Swanson*, 341 F.3d at 529 (citations omitted). Although the Court does not engraft the *Miranda* "in custody" analysis to the question of whether Woodley was on notice that he was under arrest for the purpose of a Sixth Amendment analysis, the Court believes that the factors that inform the in-custody inquiry help guide the present inquiry.

Woodley was picked up by law enforcement personnel and transported to the police station in a squad car. He was brought into an interrogation room in handcuffs. He was presented with and signed a *Miranda* waiver. When he needed a smoke break, he was put back into

14

handcuffs before being led outside by the officers. *See United States v. Gaines*, 89 F. Supp. 2d 419, 422 (W.D.N.Y. 2000) (holding that a defendant would have known he was under arrest because he was administered *Miranda* warnings, "placed in handcuffs, and was transported first to the Career Criminal Task Force offices and then later to the offices in a police vehicle," and "was under physical restraint and was not free to go at any time between the time he was taken into custody and the time of the interview"). The place of questioning was a police interrogation room. When the officers left the room, they closed the door and kept Woodley seated at the table. The questioning lasted for nearly four hours. At no time was Woodley affirmatively told that he was free to leave. *See United States v. Jimenez-Robles*, 98 F. Supp. 3d 906, 918 (E.D. Mich. 2015) ("[T]he lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention." (collecting cases)). Finally, as mentioned above, Woodley was advised during the interrogation that he had been indicted for carjacking. All of these factors show that Woodley indeed had notice that he was under arrest before he allegedly confessed.

Accordingly, based on the authority discussed above, the Court finds that Woodley's signed *Miranda* waiver was sufficient to waive his Sixth Amendment right to counsel.

## C. Spoliation

Woodley next asks the Court to order sanctions for spoliation of evidence based on the missing audio from the final 51 minutes of the videotape. While Woodley frames his motion in terms of civil spoliation law, the Government frames its response in terms of the Due Process Clause. The Court would not impose spoliation sanctions under either standard.

As this Court commented in its ruling on co-defendant Goode's spoliation motion, it is unclear whether civil spoliation law even applies in the criminal context. Moreover, like Goode,

Woodley cites *Beaven v. United States Dep't of Justice*, 622 F.3d 540 (6th Cir. 2010), and

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), "for the

proposition that courts can give an adverse inference instruction when the destruction of

evidence is merely negligent (as opposed to, say, intentional)." *United States v. Woodley*, No. 15-

CR-20007, 2016 WL 1553583, at *2 (E.D. Mich. Apr. 18, 2016). But as the Court noted in its

opinion on Goode's motion,

> Federal Rule of Civil of Procedure 37 was recently amended and "rejects cases
> such as *Residential Funding* ...that authorize the giving of adverse-inference
> instructions on a finding of negligence or gross negligence." *See* Fed. R. Civ. P.
> 37(e)(2) advisory committee's note to 2015 amendment. As the advisory
> committee notes accompanying the amendment explain,
>
>> Adverse-inference instructions were developed on the premise that
>> a party's intentional loss or destruction of evidence to prevent its
>> use in litigation gives rise to a reasonable inference that the
>> evidence was unfavorable to the party responsible for loss or
>> destruction of the evidence. Negligent or even grossly negligent
>> behavior does not logically support that inference. Information lost
>> through negligence may have been favorable to either party,
>> including the party that lost it, and inferring that it was unfavorable
>> to that party may tip the balance at trial in ways the lost
>> information never would have.

*Id.* (citing Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment.) And, as the

Court found as to Goode, Woodley "provides no reason for this Court to use the standards that

courts applied prior to the rule amendment." *Id.*

The other way Woodley could obtain relief for lost evidence is through the Fifth

Amendment's Due Process Clause. In this area, Supreme Court has developed "what might

loosely be called the area of constitutionally guaranteed access to evidence." *California v.

Trombetta*, 467 U.S. 479, 485 (1984).

The key to this analysis is to determine whether the lost evidence is "material exculpatory

evidence" or merely "potentially useful." *United States v. Wright*, 260 F.3d 568, 570 (6th Cir.

2001). Constitutional materiality means that the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 570–71. On the other hand, "potentially useful evidence" is "evidentiary material of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).

"[I]n cases where material exculpatory evidence is not accessible," *California v. Trombetta*, 467 U.S. 479, 485 (1984), its destruction violates due process "regardless of whether the government acted in bad faith." *Wright*, 260 F.3d at 571 (citations omitted). On the other hand, in "cases where potentially useful evidence is not accessible." *Wright*, 260 F.3d at 570, a defendant must establish "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996). "The first two elements of this tripartite test are inter-related," because "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* (citing *Youngblood*, 488 U.S. at 56–57).

With respect to the December 2014 carjacking, Woodley has not alleged that the final 51 minutes of audio contained exculpatory value that was apparent before the evidence was destroyed. Indeed, his motion rests on the premise that the missing audio contained his confession. The most he alleges is that the audio "could contain evidence disproving or discrediting any number of allegations against defendant." (Dkt. 114 at 6.) Accordingly, the

17

*Youngblood* standard applies, and Woodley must show the officers acted in bad faith in order to demonstrate a violation of due process. "To establish bad faith . . . a defendant must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence.'" *Jobson*, 102 F.3d at 218 (quoting *Trombetta*, 467 U.S. at 488). Negligence or even gross negligence is not enough. *Wright*, 260 F.3d at 571. Yet it appears that Woodley is arguing that the Government was merely negligent. (*See* Dkt. 114 at 6.)

And the Government's explanation at the hearing is consistent with nothing more than negligence. The Government explained that the two cameras are triggered to start recording when the light switch in the interview room is turned on. The light switch did not trigger CAM 2 (the camera recording sound) when Woodley returned from the smoke break. But the Government did not realize this until after the interview. Indeed, Dillon's January 26, 2015 FBI 302 report states, "the interview in its entirety was recorded and downloaded onto a disk." (Dkt. 114-1.) In other words, the officers' intent was to record and preserve the interview. Woodley's counsel confirmed at the hearing that she did not think there was bad faith.

Woodley also argues that should his statements be presented at trial, Federal Rule of Evidence 1002 (the "best evidence" rule) requires that the Government present the video rather than rely on the officers' testimony to establish Woodley's statements. The Court agrees with the Government that the best evidence rule does not apply in this context. The rule provides, "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evidence 1002. "Application of the rule requires a resolution of the question whether contents are sought to be proved. Thus an event may be proved by nondocumentary evidence, even though a written record of it was made." Fed. R. Evid. 1002 advisory committee's note; *see also United States v. Howard*, 953 F.2d 610, 612

(11th Cir. 1992) ("The best evidence rule . . . requires the introduction of original recordings, if at all, only when the content of the recording itself is a factual issue relevant to the use.").

Here, the Government seeks to prove the content of the officers' conversation with Woodley (specifically, the fact of his confession) rather than the content of the video recording. *See United States v. Tolliver*, No. 05-cv-80369, 2007 WL 3227592, at *2 (E.D. Mich. Nov. 1, 2007). "The [Government is] not trying to show the contents of the tape, but rather the contents of the conversation, and, therefore, as the Advisory Committee note suggests, the best evidence rule [is] inapplicable." *United States v. Fagan*, 821 F.2d 1002, 1009 n.1 (5th Cir. 1987); *see also United States v. Rose*, 590 F.2d 232, 236–37 (7th Cir. 1978). Thus, it is permissible for the officers to testify regarding Woodley's statements during the interview even though a recording was made. Moreover, the Court anticipates that Woodley will have "ample opportunity to challenge through cross-examination the [officer's] ability to hear and recollect the substance of the conversation." *Howard*, 953 F.2d at 613.

Woodley also cites Federal Rule of Evidence 106, which provides, "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." But the Government represents that it "will not introduce 'all or part' of [Woodley's] recorded statement," electing instead to rely on "eyewitness testimony." (Dkt. 122 at 8.) The Court has already found that relying on eyewitnesses rather than the recording is permissible.

Finally, aside from the above analysis, federal law does not require that a confession be videotaped. *See Kirschke v. Prelesnik*, No. 10-cv-10229, 2012 WL 1945067 (E.D. Mich. May

30, 2012) (citing cases). Nor does the internal DOJ policy manual Woodley cites create such a

right. The manual itself provides,

> This policy is solely for internal Department of Justice guidance. It is not intended
> to, does not, and may not be relied upon to create any rights or benefits,
> substantive or procedural, enforceable at law or in equity in any matter, civil or
> criminal, by any party against the United States, its departments, agencies, or
> entities, its officers, employees, or any other person . . . .

(Dkt. 114-3 at 1–2.) An internal policy that contains such a disclaimer does not create a

constitutional right or basis for suppression. *See United States v. Nagy*, 760 F.3d 485, 490 (6th

Cir. 2014), *cert. denied*, 135 S. Ct. 1009, 190 L. Ed. 2d 881 (2015); *see also United States v.

Ledbetter*, No. 2:14-CR-127, 2015 WL 7017367, at *7 (S.D. Ohio Nov. 12, 2015) (denying a

motion to suppress based on an alleged violation of an internal DOJ policy which established a

"presumption that federal agencies, including the FBI and all United States Attorneys, will

electronically record statements made by individuals in their custody under certain

circumstances").

## III. CONCLUSION

The officers who questioned Woodley did not engage in tactics that rise to the level of

violating Woodley's Fifth Amendment rights, and Woodley, during the interrogation, had actual

knowledge he was indicted and at least had constructive knowledge that he had been arrested so

he has not shown that his Sixth Amendment rights have been infringed. There is also no reason

for the Court to impose sanctions based on the missing audio from the videotape. For these

reasons, IT IS ORDERED that Woodley's Motions to Suppress Statements (Dkts. 112, 113) and

Motion for Spoliation Sanctions (Dkt. 114) are DENIED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  May 11, 2016


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 11, 2016.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson